IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-01392-PAB-MEH

BRADLEY SCHROCK,

     Plaintiff,

v.

STATE FARM AUTOMOBILE INSURANCE COMPANY,

     Defendant.

---

## ORDER

---

This matter is before the Court on Defendant's Motion to Disqualify Pursuant to *Persichette v. Owners Ins. Co.*, 462 P.3d 581 (Colo. 2020), and Federal Law [Docket No. 44]. Plaintiff responded, Docket No. 90, and defendant replied. Docket No. 103.

## I. BACKGROUND[1]

On April 15, 2019, plaintiff caused a head-on vehicle collision with a vehicle driven by Raphael Mukendi, when he drove across the center line of the roadway. Docket No. 1 at 2, ¶ 5. At the time of the collision, plaintiff was insured under a personal automobile policy issued by defendant that provided liability coverage of $250,000 per person and $500,000 per accident. *Id.*, ¶ 8. After plaintiff's wife notified defendant of the collision on April 16, 2019, defendant's adjuster informed plaintiff's wife on April 19, 2019 that they had "plenty of coverage and to not worry." *Id.*, ¶¶ 9–10. On

---

[1] These facts are taken from the Complaint and Jury Demand [Docket No. 1] and are assumed to be true for purposes of resolving the motion to disqualify.

April 30, 2019, defendant received a time-limited policy-limit demand from Mr. Mukendi. *Id.*, ¶ 11.  Defendant did not timely accept the settlement offer or inform plaintiff of the offer or of plaintiff's potential excess liability exposure; however, defendant assured plaintiff's wife that the claim would be settled.  *Id.* at 3–6, ¶¶ 12–19.

On May 26, 2019, Mr. Mukendi sued plaintiff.  *Id.* at 6, ¶ 24.  After receiving Mr. Mukendi's complaint on June 3, 2019, plaintiff and his wife tendered the lawsuit to defendant for defense.  *Id.* at 7, ¶ 28.  Mr. Mukendi asserted medical expenses exceeding $625,000.  *Id.* at 9, ¶ 35.  Defendant offered to settle the claim for plaintiff's policy limit, which Mr. Mukendi declined.  *Id.*, ¶¶ 36–37.  Plaintiff sent an excess assurance protection ("EAP") demand letter to defendant on February 4, 2020.  *Id.*, ¶ 38.  Defendant responded to that letter on March 2, 2020, indicating that it would not issue an EAP letter and that it would not be responsible for damages in excess of the policy limit.  *Id.* at 10, ¶ 39.  At a March 5, 2020 mediation, defendant's representative, Kim Gardner, expressed that she had no authority to issue an EAP letter or to negotiate above the $250,000 policy limit.  *Id.* at 12, ¶ 40.  The case proceeded to trial on March 29, 2021, and a jury awarded Mr. Mukendi $2.75 million in damages.  *Id.* at 16, ¶¶ 49–50.

Plaintiff brings claims against defendant for (1) bad faith breach of contract and (2) statutory bad faith under Colo. Rev. Stat. §§ 10-3-1115, 10-3-1116.  *Id.* at 17–19, ¶¶ 55–68.  Plaintiff is represented by Marc R. Levy and Mr. Levy's law firm, Levy Law, P.C. (collectively, "Levy Law").  Defendant seeks to disqualify Levy Law from serving as plaintiff's lawyer in this matter pursuant to federal law, Colorado Rule of Professional Conduct ("Colo. RPC") 1.9, and *Persichette v. Owners Ins. Co.*, 462 P.3d 581 (Colo.

2020), where the Colorado Supreme Court disqualified Levy Law.  *See generally*

Docket No. 44.  Plaintiff opposes the motion.  *See generally* Docket No. 90.

## II.  LEGAL STANDARD

A motion to disqualify an attorney rests with the sound discretion of the trial court.

*English Feedlot, Inc. v. Norden Lab'ys, Inc.*, 833 F. Supp. 1498, 1506 (D. Colo. 1993);

*SLC Ltd. V v. Bradford Grp. W., Inc.*, 999 F.2d 464, 466 (10th Cir. 1993) ("Ordinarily the

control of attorneys' conduct in trial litigation is within the supervisory powers of the trial

judge, and his performance in this area is a matter of judicial discretion." (quoting *Redd*

*v. Shell Oil Co. (In re Graney)*, 518 F.2d 311, 314 (10th Cir. 1975))).  "Two sources

inform whether a district court should disqualify an attorney."  *United States v. Stiger*,

413 F.3d 1185, 1195 (10th Cir. 2005), *abrogated in part on other grounds by Alleyne v.*

*United States*, 570 U.S. 99 (2013).  "First, attorneys are bound by the local rules of the

court in which they appear. . . .  Second, because motions to disqualify counsel in

federal proceedings are substantive motions affecting the rights of the parties, they are

decided by applying standards developed under federal law."  *Id.* (quoting *Cole v.*

*Ruidoso Mun. Schools*, 43 F.3d 1373, 1383 (10th Cir. 1994)).  In the Tenth Circuit,

"motions to disqualify are governed by the ethical rules announced by the national

profession and considered in light of the public interest and the litigants' rights."  *Cole*,

43 F.3d at 1383 (quotation omitted).

With exceptions inapplicable here, this District has adopted the Colorado Rules

of Professional Conduct ("Colo. RPC" or "Colorado Rules") as its standard of

professional conduct.  *See* D.C.COLO.LAttyR 2(a); *Hsin-Yi Wu v. Colo. Reg'l Ctr.*

*Project Solaris LLLP*, No. 19-cv-02443-RM-STV, 2020 WL 6044318, at *2 (D. Colo. Oct.

13, 2020).  According to the Tenth Circuit, the relevant federal law is the American Bar Association Model Rules of Professional Conduct ("ABA Model Rules"), which "reflect the national standard to be used in ruling on disqualification motions."  *Cole*, 43 F.3d at 1383.  The relevant ABA Model Rule, Rule 1.9, is identical to Colorado's Rule 1.9. *People v. Hoskins*, 333 P.3d 828, 835 n.5 (Colo. 2014).  Thus, there is substantial overlap between the local rules and federal law.  The Court notes, however, that "a violation of a disciplinary rule does not automatically result in disqualification; rather a court must determine whether the litigation can be conducted with fairness to all parties or whether the misconduct taints the trial or legal system in some way."  *Carbajal v. Am. Fam. Ins. Co.*, No. 06-cv-00608-PSF-MEH, 2006 WL 2988955, at *1 (D. Colo. Oct. 18, 2006) (citing *FDIC v. Isham*, 782 F. Supp. 524, 528 (D. Colo. 1992)).

## III.  ANALYSIS

In ruling on a motion to disqualify an attorney, the Court considers both a party's right to representation by the counsel of his choice, *see id.* at *2 (citing *Smith v. Whatcott*, 774 F.2d 1032, 1035 (10th Cir. 1985) (in denying motion to disqualify, finding insufficient grounds "to warrant denial of [parties'] right to employ counsel of their choice"); *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 441 (1985) (Brennan, J., concurring) ("A fundamental premise of the adversary system is that individuals have the right to retain the attorney of their choice to represent their interests in judicial proceedings.")), and "the public's interest in the integrity of the judicial process."  *Helmer v. Goodyear Tire & Rubber Co.*, No. 12-cv-00685-RBJ-MEH, 2012 WL 6953341, at *4 (D. Colo. Aug. 31, 2012) (citing *United States v. Collins*, 920 F.2d 619, 634 (10th Cir. 1990), *report and recommendation adopted*, 2013 WL 328951 (D. Colo. Jan. 29, 2013)).

Defendant brings this motion pursuant to Colorado's Rule 1.9.  *See generally* Docket No. 44.  As the court explained in *Stiger*, which dealt with Oklahoma Rule of Professional Conduct 1.9, which is identical to ABA Model Rule 1.9 and Colorado's Rule 1.9, a party seeking to disqualify opposing counsel under Rule 1.9 must establish that "(1) an actual attorney-client relationship existed between the moving party and the opposing counsel; (2) the present litigation involves a matter that is 'substantially related' to the subject of the movant's prior representation; and (3) the interests of the opposing counsel's present client are materially adverse to the movant."  413 F.3d at 1196 (quoting *Cole*, 43 F.3d at 1384).[3]  "If the movant establishes the first two prongs, an irrebuttable 'presumption arises that a client has indeed revealed facts to the attorney that require his disqualification.'"  *Id.* (quoting *Smith*, 757 F.2d at 1100).  This irrebuttable presumption is unique to federal law.  *See Helmer*, 2012 WL 6953341, at *4.

There is no disagreement that defendant has established the first and third prongs.  As to the first prong, Mr. Levy represented defendant for 33 or 34 years, until late 2017.  *See* Docket No. 44 at 7.  As to the third prong, plaintiff's interests are materially adverse to the movant, defendant.  The parties' dispute centers on whether this case is "'substantially related' to the subject of" Mr. Levy's prior representation of

---

[3] The relevant portion of the Colorado and ABA rules states:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

ABA Model Rule 1.9(a); Colo. RPC 1.9(a).

defendant.  *Id.* at 8; *see also* Docket No. 90 at 1.

Neither Colorado's Rule 1.9(a) nor ABA Model Rule 1.9 defines "substantially related," but Comment 3 to the rule, which is the same in both rule, "sheds light on the term."  *See Persichette*, 462 P.3d at 587.[2]  Comment 3 provides that matters are "substantially related" if (a) "they involve the same transaction or legal dispute" or (b) "there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."  Colo. RPC 1.9, *cmt.* 3; ABA Model Rule 1.9, *cmt.* 3.

Defendant argues that *Benninger v. State Farm Mut. Auto. Ins. Co.*, No. 11-cv-00495-LTB-BNB (D. Colo.), is a "prior representation" that is "substantially related" to this matter for purposes of Rule 1.9.  *See generally* Docket No. 44.  Defendant does not claim that this matter and *Benninger* are the "same transaction or legal dispute."  *See id*. The Court, therefore, focuses on part (b) of the comment.

The Court must apply the "standards developed under federal law."  *Stiger*, 413 F.3d at 1195.  However, the Tenth Circuit has not yet "waded into the thicket of the Rule 1.9 commentary," *see In re Owners Ins. Co.*, No. 20-1136, slip op. at 25 (10th Cir. July 10, 2020), and federal standards are "less than settled."  *Id.* at 29.  As in *In re Owners*, which was before the Tenth Circuit on a petition for a writ of mandamus to direct the

---

[2] The court in *Persichette* explained that "[t]he comments to the Rules of Professional Conduct do not create ethical obligations independent from the text of the rule."  *Id.* at 587 n.4 (citing *In re Gilbert*, 346 P.3d 1018, 1026 (Colo. 2015)).  "But, in interpreting a rule of professional conduct, [the court] may rely on the comments discussing it."  *Id.* (citing *People v. Frisco*, 119 P.3d 1093, 1096 (Colo. 2005)).  Federal courts may also rely on commentary.  *See Nix v. Whiteside*, 475 U.S. 157, 169–70 (1986).  The comments to Colorado's Rule 1.9 are identical to those to Model Rule 1.9.

district court to disqualify Levy Law under Rule 1.9, the "disqualification issue here depends on whether the prior matters in which Levy Law represented [defendant] are 'substantially related' to [p]laintiff's case, in which Levy has entered an appearance adverse to [defendant]." *Id.* at 8.  Given that Colorado's Rule 1.9 and commentary are identical to ABA Model Rule 1.9 and commentary, the Court finds *Persichette* and other cases discussing Colorado's Rule 1.9 persuasive.  The Tenth Circuit has also drawn upon *Persichette* and the comments to Colorado's Rule 1.9.  *See generally id.*

To answer the question of whether the "prior matters in which Levy Law represented" defendant are substantially related to plaintiff's case, *see In re Owners*, slip op. at 8, the Court must determine whether Mr. Levy "would normally have . . . obtained" material information "of a confidential factual nature" in the prior matters.  *See Persichette*, 462 P.3d at 587.  Defendant "need not establish that the attorney actually obtained such information in that representation."  *See id*.  Comment 3 acknowledges that a "conclusion about the possession" of confidential factual information "may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services."  Colo. RPC 1.9, *cmt.* 3.  The Tenth Circuit has explained that, if the movant establishes both the existence of an attorney-client relationship between the movant and the opposing counsel and that the present litigation involves a matter that is "substantially related" to the subject of the movant's prior representation, "an irrebuttable 'presumption arises that a client has indeed revealed facts to the attorney that require his disqualification.'"  *Stiger*, 413 F.3d at 1196 (quoting *Smith*, 757 F.2d at 1100).

A substantial relationship exists "if the factual contexts of the two representations are similar or related." *Smith*, 757 F.2d at 1100 (quotation omitted). "This determination hinges on the theories and allegations implicated in each representation." *Persichette*, 462 P.3d at 587. The movant must "provide the court with sufficient evidence to enable the court 'to reconstruct the attorneys' representation of the former client, to infer what confidential information could have been imparted in that representation, and to decide whether that information has any relevance to the attorney's representation of the current client.'" *Funplex P'ship v. FDIC*, 19 F. Supp. 2d 1201, 1207 (D. Colo. 1998) (quoting *English Feedlot*, 833 F. Supp. at 1506)). "If there is a reasonable probability that, during the course of the earlier representation, the former client disclosed confidential information which could be used against him in the subsequent adverse representation, the two matters are considered to be substantially related." *Id.* (citing *SLC Ltd. V*, 999 F.2d at 467 n.3 (applying similar Utah Rule of Professional Conduct 1.9)).

The Colorado Supreme Court phrases this "crucial question" as "whether the confidential factual information in the attorney's probable possession is relevant to subsequent claims in a manner that would materially advance those claims." *Persichette*, 462 P.3d at 587 (quoting *Villas at Highland Park Homeowners Ass'n v. Villas at Highland Park, LLC*, 394 P.3d 1144, 1153 (Colo. 2017) (emphasis omitted)). Answering the crucial question requires the Court to "undertake 'a fact-specific' examination" of the representations to determine the relevance of the confidential factual information. *Id.* (citing *Villas at Highland Park*, 394 P.3d at 1153).[4] For example,

---

[4] "This process, which has been coined a 'factual reconstruction,' entails

if the subsequent representation involves facts suggesting that the knowledge gained in the earlier representation would not be useful or relevant, the two cases are not "substantially related" and disqualification is not called for.  Comment 2 applies this principle, explaining that a "lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a factually distinct problem of that type even though the subsequent representation involves a position adverse to the prior client."  Colo. RPC 1.9 *cmt.* 2; ABA Model Rule 1.9, *cmt.* 2.  That is because, where a lawyer "handles recurrent yet factually distinct problems, each individual matter is likely to involve a distinct set of dispositive facts."  *Villas at Highland Park*, 394 P.3d at 1153.  Thus, the information that the lawyer may have obtained in the prior matter is "not necessarily relevant in later matters and consequently, there is no substantial risk that the attorney could use the information to gain an unfair advantage." *Id.*

On the other hand, even a factually distinct earlier representation could have provided disqualifying confidential information to counsel.  The comments provide examples.  A "lawyer who has represented a businessperson and learned extensive private financial information about that person may not then represent that person's spouse in seeking a divorce."  Colo. RPC 1.9, *cmt.* 3; ABA Model Rule 1.9, *cmt.* 3.  In that scenario, although the lawyer may not have learned the extensive private financial information in a factually analogous context, such as an in earlier divorce, the lawyer's

---

consideration of both 'the likelihood that the attorney would have been exposed to confidential client information' . . . and 'the likelihood that such confidential material will be relevant to the later representation' in a way that will 'disadvantage the former client.'"  *Id.* (quoting *People v. Frisco*, 119 P.3d 1093, 1096 (Colo. 2005)).

possession of confidential factual information from the prior representation of the businessperson would materially advantage the spouse and therefore warrant the lawyer's disqualification.  Similarly, a lawyer "who has previously represented a client in securing environmental permits to build a shopping center would be precluded from representing neighbors seeking to oppose rezoning of the property on the basis of environmental considerations" because the lawyer would likely have learned confidential factual information in the environmental permitting work that would materially advantage the neighbors.  *Id.*  However, that lawyer "would not be precluded, on the grounds of substantial relationship, from defending a tenant of the completed shopping center in resisting eviction for nonpayment of rent" because any confidential factual information the lawyer learned in the environmental permitting work would not materially advantage the tenant.  Thus, when the former client is an organization, as opposed to an individual, "general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation."  *Id.*  Ultimately, "knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation," *id.*, because the specific facts would materially advance the new client's case.  In light of these principles, Mr. Levy must be disqualified in this case if "the prior matters in which Levy Law represented" defendant are "substantially related" to this case, *see In re Owners*, slip op. at 8, such that there is a "substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance" plaintiff's position in this matter.  *See* Colo. RPC. 1.9, *cmt.* 3; ABA Model Rule 1.9, *cmt.* 3.

### A.  Levy Law's Historical Relationship with Defendant

Defendant, an insurance company, hires outside counsel to defend it in cases where policyholders accuse it of handling their claims in bad faith.  Levy Law served as one of defendant's main outside law firms.  Mr. Levy's involvement with defendant began decades ago.  As Mr. Levy stated at the scheduling conference, he represented defendant for 33 or 34 years, until 2017, and defendant was a "big client" for him and his firm.  Docket No. 33 at 66:11–67:2.  Mr. Levy does not dispute that he was one of defendant's most highly trusted outside lawyers, who advised defendant on bad faith avoidance and litigation risk, attended high-level strategy meetings with defendant's legal and claims departments, and was trusted with defendant's most sensitive and confidential factual information.  Docket No. 44-1 at 11, 16 ¶¶ 23, 32; Docket No. 44-2 at 8–10, ¶¶ 24–26, 28–29, 31; Docket No. 44-4 at 2, ¶ 5; Docket No. 44-7 at 3–4, ¶¶ 11–13.[3]  Between 1994 and 2016, State Farm paid Levy Law over $12,000,000 in connection with hundreds of matters.  Docket No. 44-1 at 17, ¶ 33.  Mr. Levy told one of his former partners, "I could never sue State Farm.  I know too much about State Farm and how they defend bad faith lawsuits."  Docket No. 44-7 at 3, ¶ 8.  Plaintiff does not

---

[3] Defendant relies on declarations provided by, among others, Marcy G. Glenn, a legal ethics expert, who defendant asked to opine on whether Mr. Levy and Levy Law have a conflict of interest in this case, *see* Docket No. 44-1; Ethan Vanderlugt, a State Farm employee since 1990, who worked on plaintiff's claim and worked with Mr. Levy when Mr. Levy represented defendant, Docket No. 44-2; Brian Arakaki, a longtime State Farm employee, who worked with Mr. Levy "frequently" between the mid-1990s until 2016, Docket No. 44-4; Franklin Patterson, a lawyer who has represented defendant for decades and attended the confidential meetings with Mr. Levy, Docket No. 44-6 at 2–7, ¶¶ 2–23; and Stuart D. Morse, a lawyer who practiced law with Mr. Levy between 1989 and 2011 and was Mr. Levy's partner for 14 years.  Docket No. 44-7 at 2, ¶¶ 4–5.

dispute these facts.  *See generally* Docket No. 90.[5]

### B.  Similarity Between This Case and *Benninger*

The Court has already briefly recounted the facts of this case.  *See* Part I, *supra*.

Plaintiff alleges that defendant breached his insurance policy by failing to settle within

the policy limit and unreasonably delayed or denied plaintiff's claim for benefits.  Docket

No. 1 at 17–19, ¶¶ 55–68.  In his common-law bad faith claim, plaintiff lists defendant's

allegedly objectionable conduct.  *See generally id.*  For instance, plaintiff alleges that

defendant: deprived plaintiff of the policy's "benefits and protections"; failed to settle for

the policy limit "after having the opportunity to do so"; exposed plaintiff to a "large

adverse judgment in excess of the [p]olicy's liability limits"; misrepresented and

concealed that Mr. Mukendi had "offered to settle the claim for the available policy limit

prior to the initiation of litigation"; failed to "reasonably communicate with [plaintiff]

during the pendency of the [c]laim"; failed to timely advise plaintiff that he seek

independent counsel; and valued its interests over plaintiffs'.  *Id.* at 18, ¶ 61.  Plaintiff

also alleges that defendant engaged in statutory bad faith by delaying and denying

payment of benefits owed to plaintiff to protect him from Mr. Mukendi's claims without a

reasonable basis.  *Id.* at 19, ¶¶ 65–66.

Defendant denies these allegations.  *See generally* Docket No. 22.  Defendant

asserts that plaintiff's claims are "barred or reduced on account of the terms . . . in the

---

[5] Plaintiff provides declarations from Michael J. Rosenberg, who served as the plaintiff's lawyer in *DeHererra v. State Farm Mut. Auto. Ins. Co.*, where defendant's EAP protocols and Auto Claim Manual were allegedly disclosed in open court, Docket No. 91-1; Alexander R. Rothrock, a legal ethics expert, Docket No. 91-3; and R. Keith Fuicelli, a lawyer who represented the plaintiff in a Boulder County District Court case where defendant provided an EAP letter.  Docket No. 91-12.

[p]olicy" and that his claims are the result of the actions of third parties over whom defendant has no control. *Id.* at 1–12. Defendant "contends this matter is a 'manufactured' bad faith claim for 'failure to settle,' i.e., a case in which the claimant attempts to burst a limit of liability insurance 'by shortening the length of the settlement offer, while starving the insurer of the information needed to make a fair appraisal of the case.'" Docket No. 44 at 6 (citing Docket No. 29 at 5; *Wade v. Emasco Ins. Co.*, 483 F.3d 657, 669 (10th Cir. 2007)). Defendant thus argues that it had no reasonable opportunity to settle this claim and that plaintiff gave defendant a "deficient time-limited settlement proposal that was incapable of acceptance." *Id.* at 6–7.

As the Court has noted, defendant identifies *Benninger* as a prior representation by Levy Law that warrants Mr. Levy's and the firm's disqualification. *Benninger* was originally brought in Weld County District Court, Case No. 11CV82 and later removed to this court. *See* Case No. 11-cv-00495-LTB-BNB ("*Benninger*"), Docket No. 2. According to the complaint, the plaintiff, Samantha Benninger, sued defendant, her insurer, for its claims-handling practices and actions after an automobile collision involving Ms. Benninger and another driver. *Id.* at 3. Ms. Benninger carried liability coverage of $100,000.00 per person and was seated in the front passenger seat of her car when it was involved in an accident that caused injuries to another driver. *Id.* The other driver incurred injuries and expenses in excess of Ms. Benninger's policy limit, but repeatedly offered to settle for the policy limit. *Id.* at 4–6. Defendant rejected each policy-limit offer and counter-offered with, at most, $34,000.00. *Id.* The other driver filed a lawsuit against Ms. Benninger in Weld County District Court. *Id.* at 6. Although defendant defended Ms. Benninger in the lawsuit, defendant failed to communicate with

her.  *Id.*  Defendant finally offered to extend the policy limits to the other driver, over a

year after the other driver filed the lawsuit against Ms. Benninger, but, by that time, the

other driver's expenses had increased and she did not accept the policy-limit offer.  *Id.*

Defendant never advised Ms. Benninger that she should seek independent counsel or

of her potential personal exposure in the event of a jury verdict in excess of her policy

limits.  *Id.* at 7.  The jury ultimately returned a verdict against Ms. Benninger for over

$2,300,000.  *Id.*  Ms. Benninger sued defendant for bad faith, breach of fiduciary duty,

and negligent claims-handling practices.  *See id.* at 8–12.  The parties stipulated to the

dismissal of the case before filing any dispositive motions.  *See Benninger*, Docket Nos.

35, 36.

  According to Juan Enriquez, who has worked for defendant since 1987 and who

worked on the *Benninger* case with Levy Law as a State Farm Auto Claim Consultant,

defendant's defense in *Benninger* included arguments that "Ms. Benninger's claims may

be limited by the terms and conditions of her insurance policy, that she failed to comply

with all conditions precedent to the bringing of the action, that she failed to cooperate,

and that her damages 'may have been caused by the negligence of others for whom

State Farm is not responsible or over whom State Farm has no control,'" *see* Docket

No. 44-3 at 9–10, ¶ 31, and defendant blamed Ms. Benninger's lawyers for causing the

underlying claim not to settle, *see id.* at 10, 13, ¶¶ 32, 40–41, based on *Wade*.  *Id.* at 10,

11–12, ¶¶ 32–33, 38.  Additionally, defendant argued that Ms. Benninger's settlement

proposal had "a defect which affected State Farm's ability to accept," that her lawyers

"did not provide State Farm with information necessary for settlement," *see id.* at 10–11,

13, ¶¶ 34–36, 41, that the Colorado bad-faith statutes afforded Ms. Benninger no

remedy, and that defendant was not required to give Ms. Benninger an EAP letter.  *Id.* at 13–14,  ¶¶ 42–43.

Defendant argues that its defense of this matter is "materially identical" to its defense in *Benninger*.  Docket No. 44 at 9.  Additionally, Mr. Enriquez stated that this case and *Benninger* are "factually strikingly similar" and noted that the "similarities between the[ cases] are numerous and substantial."  Docket No. 44-3 at 7, ¶ 18.  Ms. Glenn, who reviewed both the *Benninger* files and the materials in this case, stated that the two cases are "highly similar."  Docket No. 44-1 at 17, ¶ 34.

Although plaintiff concedes that *Benninger* and this case involve "similar causes of action," he argues that the cases are "factually distinct."  Docket No. 90 at 3.  Plaintiff asserts that the two cases involved a "different underlying loss," a "jury trial resulting in an excess verdict," and "different negotiations prior to the verdict," and that *Benninger* involved the "need to address an outstanding work comp lien as justification for not paying."  *Id.*  Beyond identifying these distinctions, which plaintiff does not explain in greater detail, plaintiff does not distinguish the facts or legal theories in *Benninger* from this case.  The Court agrees with defendant that the two cases are factually and legally very similar.  The factual and legal similarities, however, are not sufficient for the Court to conclude that the two cases are "substantially related."  Rather, "the critical question in determining whether two matters are 'substantially related' is 'whether the confidential factual information in the attorney's probable possession is relevant to subsequent claims in a manner that would materially advance those claims.'"  *Persichette*, 462 P.3d at 587 (citing *Villas at Highland Park*, 394 P.3d at 1153).  Thus, even if *Benninger* and this case were not "factually strikingly similar," *see* Docket No. 44-3 at 7, ¶ 18, Comment

3's example of the businessperson's divorce shows that a lawyer can learn confidential factual information that is damaging to a former client and therefore disqualifying even if the latter case is not factually indistinguishable. *See* Colo. RPC 1.9, *cmt*. 3; ABA Model Rule 1.9, *cmt*. 3.

### C.  Probable Possession of Confidential Factual Information that is Materially Adverse to Defendant

The parties dispute whether Levy Law is in probable possession of confidential factual information that would materially disadvantage defendant.  Defendant argues that Levy Law has "received in cases similar to this one," such as *Benninger*, confidential information regarding defendant's claims handling policies and procedures, negotiation strategy, settlement pay ranges, and settlement strategy.  Docket No. 44 at 5.  In particular, defendant asserts that it shared confidential internal documents with Levy Law in *Benninger* that are relevant to this dispute, including defendant's "Auto Claim Manual," portions of which are "confidential, proprietary, and trade-secret material."  *Id.* at 10.  Defendant states that the Auto Claim Manual contains defendant's protocols for issuing EAP letters, which are "highly confidential" trade secrets.  *Id.* Defendant argues that Levy Law "succeeded in not producing [the EAP section] to opposing counsel" in discovery in *Benninger* because, Levy Law argued, the document constituted a confidential trade secret.  *Id.*  Mr. Morse, who is one of Mr. Levy's former law partners, stated that Mr. Levy told him that the EAP criteria are "highly confidential." Docket No. 44-7 at 4, ¶ 14.

Defendant also states that Levy Law learned information that is potentially damaging to defendant in "confidential strategic communications" with defendant that defendant states "would never be produced in discovery," Docket No. 44 at 10 (citing

Docket No. 44-3 at 15–16, ¶¶ 51–56), in the form of a telephone call between Mr. Levy, a colleague of his, and defendant's "claim personnel" regarding an EAP letter. *See* Docket No. 44-1 at 22, ¶ 41. Mr. Enriquez states that Levy Law received information about defendant's settlement process and confidential financial settlement information in *Benninger*, including defendant's confidential range for beginning negotiation, as well as defendant's ultimate settlement authority. Docket No. 44-3 at 17–18, ¶¶ 60–69.

Defendant argues that Levy Law received other confidential information during Mr. Levy's longstanding attorney-client relationship with defendant. According to defendant, Levy Law learned confidential, proprietary information regarding defendant's claims-handling procedures, techniques, and policies, which Levy Law "routinely" argued was not discoverable. Docket No. 44 at 11. Additionally, for the last 15 years that Levy Law represented defendant, Mr. Levy "regularly attended selective, invitation-only, 'high-level' legal strategy meetings" with defendant's claim leadership and "select outside counsel." *Id.* Defendant and outside counsel discussed "confidential information about every type of claim and bad faith risk" that defendant encountered, including "legal strategies and concerns regarding bad faith avoidance and litigation defense, liability claim involving time-limited policy limit demands, EAP-related issues, first- and third-party bad faith claims, excess liability, discovery issues, and issues affecting settlement," as well as "potential vulnerabilities" in bad faith litigation. *Id.* at 11–12 (citing Docket No. 44-1 at 28–29, ¶¶ 57–58). According to Mr. Enriquez and Mr. Arakaki, Mr. Levy was "one of the most vocal outside counsel at the meetings" and consistently provided his "legal and strategic advice" regarding "almost every topic, including bad faith avoidance and Colorado bad faith litigation risk." Docket No. 44-3 at

19, ¶ 72; Docket No. 44-4 at 5, ¶ 15.  Mr. Patterson, who has represented defendant for 39 years and attended these meetings, confirmed that the meetings were "highly confidential," covered a wide array of attorney-client protected information, including all sorts of bad faith topics, and that Mr. Levy was "present at all or almost all" of the meetings and was "one of the most vocal and active participants in providing advice and recommendations."  Docket No. 44-6 at 3–7, ¶¶ 11–22.  Mr. Levy shared with Mr. Morse that Mr. Levy had "attended high-level strategy meetings with various State Farm personnel to teach and train company personnel on how to avoid and minimize bad faith litigation risk, and to defend such risk after litigation had been filed."  Docket No. 44-7 at 3, ¶ 11.

Defendant further states that Levy Law obtained confidential information in the course of Levy Law's handling hundreds of bad-faith matters for defendant.  Docket No. 44 at 12–13.  These matters involved time-sensitive policy-limit settlement demands, EAP issues, settlement authority discussions, negotiation and litigation strategy discussions, hierarchy of settlement authority, defendant's process for deliberating and authoring settlement or choosing to litigate.  *Id.*  Levy Law also maintains a "library of approximately 85 State Farm client files from past engagements," and Mr. Levy has indicated that he does not believe that it is a violation of the rules of professional conduct to review those files in representing plaintiff in this matter.  *Id.*  Finally, during Levy Law's representation of defendant, Mr. Levy personally worked, in an attorney-client relationship, with two "key potential witnesses" in this matter, Mr. Vanderlugt and Ms. Gardner, both of whom shared confidential information with Levy Law during previous representations.  *Id.* at 13.  Defendant asserts that the confidential factual

information that Levy Law has received is not obsolete.  *Id.*

Plaintiff disagrees with defendant's assertion that Levy Law has confidential factual information in its probable possession that is relevant to this matter and would be materially advantageous to plaintiff.  *See generally* Docket No. 90.  The Court identifies three main arguments in plaintiff's response: (1) defendant has identified only one substantially similar case, *Benninger*, but that case is more than ten years old and Mr. Levy did little work on it, so defendant has not shown that, in *Benninger*, Mr. Levy would normally have been provided confidential factual information; (2) aside from information about the EAP program, which Mr. Levy never had and which was not confidential and is obsolete, defendant has not identified the actual confidential information in Levy Law's probable possession; and (3) defendant has not shown that any of the information allegedly in Levy Law's probable possession is materially advantageous to plaintiff.  *Id.*  The Court notes, however, that defendant is not "required to provide direct evidence of its previous disclosures" to Levy Law.  *See, e.g.*, *Stiger*, 413 F.3d at 1196 ("If the movant establishes the first two prongs, an irrebuttable 'presumption arises that a client has indeed revealed facts to the attorney that require his disqualification.'" (quoting *Smith*, 757 F.2d at 1100)); *Persichette*, 462 P.3d at 587 ("The former client shouldn't have to 'reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter.'" (quoting Colo. RPC, *cmt.* 3)).[6]

---

[6] Plaintiff discounts Mr. Levy's working relationship with Mr. Vanderlugt, who is an examiner in this case.  Mr. Vanderlugt states that he worked with Mr. Levy on bad faith litigation matters, when Levy Law represented defendant, and shared with Mr. Levy confidential and privileged litigation and settlement strategies.  *See* Docket No. 44-2 at 9, ¶¶ 27–29.  Mr. Levy also worked with Ms. Gardner on bad faith matters, and Mr. Levy

### 1.  Confidential Factual Information in Levy Law's Probable Possession

First, plaintiff argues that *Benninger* is the only prior matter that is even arguably related to this case.  Docket No. 90 at 2.  But *Benninger*, according to plaintiff is not sufficient for defendant to meet the high burden of disqualification because the case is at least a decade old, Mr. Levy only did 30.6 hours of work on the case, and no one who is involved in *Benninger* is involved in this case.  *Id.* at 2–3.  Defendant does not dispute that *Benninger* was filed in 2011 or the hours that Mr. Levy worked on the case.  *See generally* Docket No. 103.

Plaintiff reads the disqualification standards too narrowly.  First, the Court may presume that defendant revealed confidential facts to Levy Law given the substantial similarity between *Benninger* and this case, as discussed below.  *See Stiger*, 413 F.3d at 1196.  Second, aside from the argument that the information Mr. Levy received in *Benninger* is obsolete, which the Court considers below, a representation from 2011 could disqualify a lawyer if there is still a "substantial risk that confidential factual information" that the lawyer obtained "would materially advance the client's position in the subsequent matter."  Colo. RPC 1.9, *cmt.* 3; ABA Model Rule 1.9, *cmt.* 3.  It is true that "[i]nformation acquired in a prior representation may have been rendered obsolete by the passage of time, [which] may be relevant in determining whether two representations are substantially related," *id.*, but defendant has provided a declaration that the information is not obsolete.  Docket No. 44-1 at 21, 26–27, 31, ¶¶ 40, 53, 63.

---

provided legal strategy advice to Ms. Gardner.  *See generally* Docket No. 44-5.  Mr. Levy essentially asks the Court to ignore these relationships because neither Mr. Vanderlugt nor Ms. Gardner worked on *Benninger*.

Similarly, even though Mr. Levy apparently billed only 30.6 hours in *Benninger*, there could still be "confidential factual information" in Levy Law's probable possession that is relevant to plaintiff's in a manner that would "materially advance" those claims.  Colo. RPC 1.9, *cmt.* 3; ABA Model Rule 1.9, *cmt.* 3; *Persichette*, 462 P.3d at 587 (quoting *Villas at Highland Park*, 394 P.3d at 1153).  Moreover, conflicts "particular to individual lawyers within a firm can, in certain circumstances, be imputed to the entire firm," and vice versa.  *See People v. Shari*, 204 P.3d 453, 459 (Colo. 2009) (citing Colo. RPC 1.10).

Third, although defendant has identified only one case in which it argues Levy Law learned confidential factual information, the "disqualification issue here depends on whether the prior matters in which Levy Law represented [defendant] are 'substantially related' to [p]laintiff's case."  *See In re Owners*, slip op. at 8.  As noted earlier, Mr. Levy represented defendant for 33 or 34 years and was one of defendant's most trusted outside counsel in many matters.  Tellingly, Mr. Levy told Mr. Morse, one of his former colleagues, that he "could never sue State Farm" because he "know[s] too much about State Farm and how they defend bad faith lawsuits."  *See* Docket No. 44-7 at 3, ¶ 8.

Plaintiff also misreads *Persichette*.  In that case, the plaintiff, who was represented by Levy Law, sued Owners Insurance Company, his insurance company, for bad faith, alleging that Owners failed to reasonably evaluate his claim, timely pay benefits, communicate with his lawyer, or consent to a proposed settlement with the other driver.  *Persichette*, 462 P.3d at 584.  The defendant moved to disqualify Levy Law under Colorado's Rule 1.9 because Levy Law represented the defendant in hundreds of cases for over a decade.  *Id.*  The district court denied the motion.  *Id.*  The

Colorado Supreme Court accepted interlocutory review and reversed the district court. *Id.* The Colorado Supreme Court held that the district court "misconstrued 'a substantially related matter' to mean 'the same' matter" and in "holding that the information Levy Law probably possesses as a result of the prior representation of [the defendant] is neither confidential nor advantageous to [the plaintiff]." *Id.* at 588. The court determined that the district court "should have disqualified Levy Law in order to preserve the integrity and fairness of these proceedings." *Id.*

In answering the crucial question of whether Mr. Levy's prior representation gave him confidential factual information that was relevant to and would materially advance the plaintiff's claims, the court did not identify, much less focus on, a single prior representation. *See id.* at 587–92. Similarly, the district court did not consider any specific prior matter, but instead considered Levy Law's history of representing the defendant. *See Persichette v. Owners Ins. Co.*, 2019 Colo. Dist. LEXIS 5149, *12 (Weld Cnty. Dist. Ct. Aug. 14, 2019). Although the district court reached an erroneous conclusion, the Colorado Supreme Court found the district court's order "thorough" and noted that the lower court properly focused on the similarity in legal material and theories in the matters that Levy Law handled for the defendant. *See Persichette*, 462 P.3d at 590 ("In its thorough order, the district court stated that Levy Law's prior representation of Owners and current representation of Persichette involve 'the same legal material and theories,' including bad faith theories and attacks on claims-handling practices.").

The Colorado Supreme Court noted that Mr. Levy represented the defendant, Owners Insurance Company, in 455 cases over a 13-year period. *See id.* at 584. The

court determined that Levy Law likely gleaned confidential client information during Levy Law's prior representation of the defendant such as the defendant's "general claims-handling policies and procedures, hierarchy of settlement authority, negotiation strategies, settlement pay ranges, and the factors [the defendant] considers in assessing whether to settle a claim." *Id.* at 590.  The court reached this conclusion without requiring the defendant to have identified just one case where Mr. Levy learned all of this confidential information.  Like *Persichette*, the Court here cannot ignore Mr. Levy's  years of representing defendant and his exposure to defendant's confidential factual information.  *See In re Owners*, slip op. at 8 ("[T]he disqualification issue here depends on whether the prior *matters* in which Levy Law represented Owners are 'substantially related' to [p]laintiff's case." (emphasis added)).

Plaintiff argues that defendant "does not disclose the actual information allegedly provided" to Mr. Levy and "fails to provide evidence as to what 'confidential factual information'" would have ordinarily been provided to a lawyer in a case like *Benninger*. Docket No. 90 at 3.  Defendant, however, did describe the information that it believes Mr. Levy has in his probable possession.  *See* Docket No. 44 at 8–11.  This includes "confidential internal documents" such as the Auto Claim Manual, the EAP protocols, defendant's confidential settlement amounts, the ultimate settlement authority, and information about litigation strategy.  *Id.* at 10–11.  As to Levy Law's argument that defendant has not identified "the actual information," the Colorado Supreme Court explained that, "[w]hile the moving party must show that its former lawyer 'would normally have . . . obtained' material information of a confidential factual nature in the prior representation, it need not establish that the attorney *actually obtained* such

information in that representation." *Persichette*, 462 P.3d at 587.  This is consistent with

the presumption in *Stiger.  See* 413 F.3d at 1196.  As *Persichette* explained, "Comment

3 acknowledges that '[a] conclusion about the possession' of confidential factual

information 'may be based on the nature of the services the lawyer provided the former

client and information that would in ordinary practice be learned by a lawyer providing

such services.'"  462 P.3d at 587 (quoting Colo. RPC 1.9, *cmt.* 3).  The court noted that

"[t]his makes sense" because "[t]he former client shouldn't have to 'reveal the

confidential information learned by the lawyer in order to establish a substantial risk that

the lawyer has confidential information to use in the subsequent matter.'"  *Id.* (quoting

Colo. RPC 1.9, *cmt.* 3).

   Plaintiff stresses that the only "specific information" that defendant has identified

is the EAP program.  Docket No. 90 at 3, 9–11.  Plaintiff, however, insists that the EAP

procedures are not "confidential factual information" because they are "publicly

available" and are "produced routinely by [defendant] to opposing litigants" and would

be produced to plaintiff.  *Id.* 9.

   Plaintiff argues that the EAP criteria were "publicly announced" during testimony

of Elton Moskalski, a high-level State Farm executive, at a public trial in Utah.  *Id.* at 9–

10.  Mr. Levy's declaration quotes a transcript from the trial in which Mr. Moskalski

described a letter that may be provided to an insured, "saying that as long as they

continue to do their duty under the policy, and that is to cooperate and assist us in the

trial of the case, and there's no collusion, and that we have, in fact, gotten a demand

within the policy limits, then they will get a letter that says, 'we accept the financial

responsibility that may result from this decision.'  And I guess you'd call it a peace of

mind letter."  Docket No. 90-1 at 12.  Mr. Levy states that Mr. Moskalski also testified,
"what we're going to say is that, '[w]e think this is a case that needs to be tried.  We've
had a demand within your policy limits, and we know that you might be concerned about
that.  We're telling you that we're going to trial, and in doing so, we recognize the risk
involved.  We're willing to accept the consequences.  And if this comes in greater than
your policy limits, we're going to step forward, file a full supersedeas bond if the case
has to be appealed, or we'll pay it in full, so that you have no responsibility.'"  *Id.* at 13.
The existence of the EAP program – that defendant will cover an excess judgment if it
previously refused to accept a policy-limit settlement offer – is not the materially
advantageous confidential information that defendant believes Mr. Levy has obtained in
his representation of defendant, however.  In fact, defendant issues EAP letters often
enough that the existence of the program is likely to be publicly known.  *See
Persichette*, 462 P.3d at 587 ("any information that has already 'been disclosed to the
public . . . will not be disqualifying'" (quoting Colo. RPC 1.9, *cmt.* 3)).  Rather, it is the
criteria for issuing an EAP letter and making such a guarantee to its insureds that
defendant considers confidential.  Mr. Moskalski's testimony describes what an EAP
letter might say, not the conditions necessary for the issuance of one.

Second, plaintiff argues that the "seven" criteria for issuing the EAP letter were
disclosed in "a very recent non-confidential deposition transcript."  Docket No. 90 at 10.
Plaintiff provides an excerpt of the transcript.  *See* Docket No. 91-2.  The deponent is
asked whether defendant has "any policies and procedures regarding comfort letters or
assurance protection letters."  *Id.* at 1.  The deponent states, "[y]es, we have guidelines"
and continues, "[t]here are seven criteria.  I do not have them all memorized."  *Id.* at 2.

When asked if the deponent knows any of the criteria, he says that the most important one is "regarding whether or not policy limits have been extended or offered." *Id.* The deponent continues, "[t]here are seven criteria. The very last one is have policy limits been extended or offered. If so, depending on how it meets the other . . . criteria, then there would be a determination of – usually that we would not because we have offered policy limits." *Id.* at 2–3. The deponent then states that he does not remember any of the other criteria. *Id.* at 3. As with Mr. Moskalski's testimony, this testimony does not indicate that defendant has publicly revealed the criteria that defendant considers before issuing an EAP letter. Instead, this testimony reveals that one criteria for issuing an EAP letter is that defendant has received a policy-limit settlement offer. But an EAP letter is, by definition, provided to an insured when defendant has rejected a policy-limit settlement offer. Thus, the fact that one criteria is that there has been a policy-limit settlement offer does not mean that Mr. Levy is not in probable possession of confidential factual information that would be materially advantageous to plaintiff.

Third, plaintiff states that the discovery responses in *Bernall v. State Farm* "show that State Farm not only provided those same seven criteria to an opposing litigant in discovery, but did so without seeking any protective order." Docket No. 90 at 10. Defendant was represented in that case by Jon Sands and, although the discovery responses do list the seven EAP criteria, *see* Docket No. 91-5 at 7, Mr. Sands has provided a declaration stating that, without express authority from defendant, which he does not recall having ever received, he would not have intentionally produced the EAP criteria without safeguarding its confidentiality, such as through an agreement with opposing counsel to keep the information confidential or a protective order. Docket No.

93-1 at 2, ¶ 10.  Mr. Sands has also confirmed that the EAP criteria were produced to opposing counsel pursuant to a confidentiality agreement.  Docket No. 103-4 at 1–2, ¶¶ 2–3.  *Bernall*, therefore, does not show that the factual information that Mr. Levy probably possesses is not confidential and therefore not disqualifying.

Fourth, plaintiff states that "State Farm concedes that it produces [the EAP manuals or guidelines] in response to discovery requests."  Docket No. 90 at 10.  Plaintiff cites Mr. Enriquez's declaration.  *Id.* (citing Docket No. 44-3 at 2, ¶ 10).  That portion of Mr. Enriquez's declaration states that the EAP section of the Auto Claim Manual is "confidential" and "not produced in litigation except under a non-sharing protective order."  Docket No. 44-3 at 2, ¶ 10.  Thus, Mr. Enriquez's declaration does not support plaintiff's reading of it.

Defendant, however, disclosed the EAP protocols in *DeHererra v. State Farm*, a Denver District Court case.  *See* Docket No. 90 at 11; Docket No. 91-1.  Although defendant produced the EAP protocols under a protective order, the judge denied a request for defendant to "maintain the 'confidential' designation of these documents for purposes of trial," and the protocols were "accepted into evidence free of any confidential designation."  Docket No. 91-1 at 3, ¶¶ 9–12.  Plaintiff insists that information produced under a protective order is still information that is disclosed to the public and is therefore not disqualifying, but plaintiff provides no binding authority for this proposition.  Docket No. 90 at 10 (citing Colo. RPC 1.9, *cmt.* 3); *cf. In re Owners*, slip op. at 23 (noting Owners provided no authority for the broad holding that discoverable information can never be confidential factual information).  Defendant analogizes to a trade secrets dispute, where the Tenth Circuit held that, although the

information was disclosed at a hearing, the plaintiff's "post-hearing measures to protect the confidentiality" of the information meant that the information retained its status as trade secrets. *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 849 (10th Cir. 1993) ("Gates evidenced a continuing intent to maintain the secrecy of the constants.  Under Colorado law, the holder of a trade secret is only required to exercise reasonable efforts to maintain its secrecy.").  *Gates Rubber* is not persuasive because the case was limited to disclosure of trade secrets law, which is not an analogous context to attorney disqualification.  The Court notes, however, that the American Bar Association has issued a formal opinion on ABA Model Rule 1.9.  *See* Docket No. 103-1 at 7.  ABA Model Rule 1.9(c)(1) prohibits a lawyer who has formerly represented a client from using "information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known."  This is referred to as the "generally known" exception.  The ABA explains that the "generally known" exception is "limited."  ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 479, at 1 (2017).  The exception "applies (1) only to the use, and not the disclosure or revelation, of former-client information; and (2) only if the information has become (a) widely recognized by members of the public in the relevant geographic area; or (b) widely recognized in the former client's industry, profession, or trade."  *Id.*  "Information is not 'generally known' *simply because it has been discussed in open court, or is available in court records*, in libraries, or in other public repositories of information."  *Id.* (emphasis added).[7]  The

---

[7] The Tenth Circuit has cited ABA formal opinions in interpreting ABA Model Rules.  *See, e.g., In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1203 n.2 (10th Cir. 2016) (citing ABA Comm. on Ethics & Prof'l

Court, therefore, does not find the fact that the confidential EAP criteria were disclosed in open court in *DeHerrera*, despite defendant's attempts to protect it, means that the EAP criteria are "generally known" for the purpose of Rule 1.9.

Mr. Levy also has learned other confidential factual information about defendant that another plaintiff's lawyer likely would not know.  Mr. Levy attended legal strategy meetings, engaged in attorney-client privileged discussions with defendant's in-house lawyers, and learned confidential information from Mr. Vanderlugt and Ms. Gardner. Docket No. 44 at 11–13.  Mr. Levy has a library of client files.  *Id.* at 13.  Mr. Levy obtained this confidential information through his decades of representing defendant, and it is even more sensitive than "information that would in ordinary practice be learned by a lawyer providing such services" to defendant, which is all that disqualification requires.  *See* Colo. RPC 1.9, *cmt.* 3; ABA Model Rule 1.9, *cmt.* 3.  Mr. Levy was one of defendant's most highly trusted outside lawyers and regularly attended high-level legal strategy meetings, where he was an active participant, regularly for over a decade. *See, e.g.*, Docket No. 44-3 at 19, ¶ 72 (noting that Mr. Levy was "one of the most vocal outside counsel at the meetings" and consistently provided his "legal and strategic advice" regarding "almost every topic, including bad faith avoidance and Colorado bad faith litigation risk"); Docket No. 44-6 at 3–7, ¶¶ 11–22 (noting that the meetings covered a wide array of attorney-client protected information, including all sorts of bad faith topics, and that Mr. Levy was "present at all or almost all" of the meetings and was "one of the most vocal and active participants in providing advice and recommendations").

---

Responsibility, Formal Op. 07–445 (2007)); *United States v. Elliott*, 684 F. App'x 685, 693 (10th Cir. 2017) (unpublished) (citing ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 95-396, at 11 (1995)).

Although the fact that Mr. Levy *provided* his advice to defendant at strategy meetings may not be immediately relevant to whether he *learned* confidential factual information that would materially advance plaintiff's claims in this case, the court in *Persichette* was "troubled . . . by the prospect that this case will require Levy Law to attack its own work, including the very policies and procedures the firm helped Owners put in place."  462 P.3d at 591.  The Court here has similar concerns.

Plaintiff argues that defendant has "not demonstrated that any information discussed in these meetings would not be obsolete today."  Docket No. 90 at 5. Defendant, however, states in the motion that the information is not obsolete, Docket No. 44 at 13, which Mr. Enriquez, Mr. Vanderlugt, and Mr. Patterson confirm.  Docket No. 44-3 at 16–17, ¶ 58; Docket No. 44-2 at 7, ¶ 15; Docket No. 44-6 at 11, ¶ 40.

Plaintiff argues that defendant has not shown that Levy Law has any information in its probable possession from these meetings.  Docket No. 90 at 5.  But, given that Mr. Levy learned about and discussed bad faith cases, strategy, and facts at high-level, confidential meetings for over a decade, and that the information is not obsolete, the Court finds that Mr. Levy has "confidential factual information" in his "probable possession" that is "relevant to subsequent claims in a manner that would materially advance those claims."  *Persichette*, 462 P.3d at 587 (quoting *Villas at Highland Park*, 394 P.3d at 1153); *see also* Colo. RPC. 1.9, *cmt.* 3; ABA Model Rule 1.9, *cmt.* 3. Moreover, under *Stiger*, there is an irrebuttable presumption that the client revealed confidential facts requiring disqualification.  *See Stiger*, 413 F.3d at 1196; *see also Persichette*, 462 P.3d at 587 ("While the moving party must show that its former lawyer 'would normally have . . . obtained' material information of a confidential factual nature

in the prior representation, it need not establish that the attorney *actually obtained* such information.").  The confidential factual and legal strategy information that Mr. Levy learned from these meetings, according to attendees like Mr. Patterson and other declarants, is more than "general knowledge" of defendant's "policies and practices." *Cf. Watkins v. Trans Union, LLC*, 869 F.3d 514, 525 (7th Cir. 2017) ("The general knowledge [the attorney] gained while working at Trans Union is not the type of confidential information that poses a substantial risk of materially advancing [the plaintiff's] claims.").

Plaintiff argues that the information Mr. Levy obtained is non-disqualifying "playbook" information, not disqualifying confidential factual information.  Docket No. 90 at 11–13.  The court rejected this argument in *Persichette* regarding much of the same type of confidential information about that insurer.  *Persichette*, 462 P.3d at 590–92. The court explained that "playbook" information "refers to a client's policies and procedures."  *Id.* at 590 (citing *Velazquez-Velez v. Molina-Rodriguez*, 235 F. Supp. 3d 358, 361 (D.P.R. 2017)).[8]  "Such information, though 'not in itself cause for disqualification,' may well 'factor into the decision to the extent it is relevant and gives the non-moving party an unfair edge in the litigation.'"  *Id.* (quoting *Velazquez-Velez*, 235 F. Supp. 3d at 361 (citing Charles W. Wolfram, *Former Client Conflicts*, 10 Geo. J. Legal Ethics 677 (1997))).  The court explained that the relevant factual findings

---

[8] The Tenth Circuit has explained that, "[w]hen a lawyer has represented an organizational client, the client may feel that the lawyer's general familiarity with its procedures and policies would give a subsequent client an unfair edge over it in another matter.  This kind of general knowledge is called 'playbook' information.'"  *In re Owners*, slip op. at 22 n.7 (quoting Ann. Mod. Rules Prof. Cond. § 1.9 annotation (9th ed. 2019) (annotation regarding "playbook")).  Courts are split as to whether "playbook" information is disqualifying.  *Id.* (quoting Ann. Mod. Rules Prof. Cond. § 1.9 annotation).

undermined the district court's conclusion that the information Levy Law probably possessed was not disqualifying.  *Id.*  As in *Persichette*, the information that defendant and its declarants argue Mr. Levy probably possesses is not just information about defendant's general policies and practices, but is sensitive, confidential information.

In fact, the information that defendant claims Mr. Levy probably possesses is the same kind of information that the court in *Persichette* found sufficient for Levy Law's disqualification.  The court noted that, during Mr. Levy's decades of representing Owners, "Levy Law learned about Owners' general claims-handling policies and procedures, hierarchy of settlement authority, negotiation strategies, settlement pay ranges, and the factors Owners considers in assessing whether to settle a claim." *Persichette*, 462 P.3d at 590.  The court continued, "Levy Law provided advice and training to Owners and Owners' employees on the policies and procedures Owners uses to handle claims involving uninsured motorists, unreasonable delay, and bad faith – precisely the types of claims at issue here."  *Id.*  "Not only did Levy Law defend Owners in many cases against claims like the ones brought by Persichette, it worked closely with Page, the claims adjuster whose actions lie at the core of this case.  Levy Law instructed Page on claims-handling and bad-faith-avoidance practices and educated him on being an effective witness."  *Id.*  The court also noted that "Levy Law is familiar with [the adjuster's] higher-ups, is keenly aware of their personalities and tendencies, and has inside information on how they come across as witnesses."  *Id.* Here, Mr. Levy learned, through *Benninger* and other cases, not only about defendant's general policies and procedures, which alone would not be sufficient for disqualification, but also about the hierarchy of settlement authority, negotiation strategies, and

settlement pay ranges.  As in *Persichette*, Mr. Levy provided advice and counsel to

defendant in his more than 30 years representing defendant.  Mr. Levy received advice

and counsel in defendant's confidential meetings, and he shared his experience with

Mr. Vanderlugt and Ms. Gardner, possible witnesses in this case, in an attorney-client

relationship, and with their higher-ups as well.  Finally, as in *Persichette*, "[t]his

information is not ubiquitous in the insurance industry," and plaintiff is not "likely to

obtain the bulk of it through discovery."  *Id.*

Plaintiff argues that defendant has not shown that counsel in *Benninger* normally

would have been provided confidential factual information.  Docket No. 90 at 15–16.

This argument is unconvincing because defendant has shown that Mr. Levy was

provided confidential factual information in *Benninger*.  Moreover, defendant has shown

an actual attorney-client relationship existed between defendant and Mr. Levy and that

this case is substantially related to Mr. Levy's other representations of defendant, such

as *Benninger*.  The Court thus concludes that Mr. Levy "probably possesses confidential

factual information" about defendant, which he obtained in his prior representation of

defendant, and that this information "is relevant to subsequent claims."  *See*

*Persichette*, 462 P.3d at 587–90; *see also* Colo. RPC. 1.9, *cmt.* 3; ABA Model Rule 1.9,

*cmt.* 3.[9]

---

[9] Plaintiff relies on *In re Owners*, where the Tenth Circuit denied a petition for a
writ of mandamus to direct the district court to disqualify Levy Law.  Docket No. 90 at
12.  Although that decision is instructive for the disqualification standards and the
interplay between federal and state rules, the favorable result that Mr. Levy obtained
was due to "the high bar for obtaining relief in mandamus."  *See In re Owners*, slip op.
at 29.  The court noted, "we acknowledge that, if this matter were before us in the
context of an appeal, we could conclude that the district court erred in denying Owners'
disqualification motion in light of *Persichette*'s holding.  But mindful of the high bar for
obtaining relief in mandamus, we do not believe that decision *requires* us to issue a writ

### 2.  Whether the Material Will Advantage Plaintiff or Disadvantage Defendant

Plaintiff argues that there is no indication that plaintiff will obtain a material advantage in this lawsuit from this information.  Docket No. 90 at 16–18.  Although a party bringing a disqualification motion in state court may have to show that knowledge obtained in the prior representation will be used in the current lawsuit, in federal court, "[i]f the movant establishes the first two prongs, an irrebuttable 'presumption arises that a client has indeed revealed facts to the attorney that require his disqualification.'"  *See Stiger*, 413 F.3d at 1196; *Helmer*, 2012 WL 6953341, at *3.

Plaintiff asserts that, because *Benninger* is eleven years old, information from it must be obsolete.  Docket No. 90 at 16 (citing *Watkins*, 869 F.3d at 522–23 (finding passage ten years meant that the information was obsolete and that it was unlikely that an organizational client would be "static" in its litigation practices); *Villas at Highland Park*, 394 P.3d at 1158 (Gabriel, J. dissenting) (noting that the lawyer last represented the former client more than a decade before)).  The only argument plaintiff offers in support of this assertion is that given that defendant did not issue an EAP letter to plaintiff in this case, because defendant was "convinced it acted reasonably and appropriately," and yet did issue an EAP letter in *Benninger*, the EAP criteria must have changed.  *Id.* at 18.  The Court is not convinced that defendant's decision not to issue an EAP letter to plaintiff means that the EAP criteria that Mr. Levy probably possesses from prior matters are obsolete.  *See Stiger*, 413 F.3d at 1196 (noting the presumption in favor of the moving party).  Moreover, Mr. Vanderlugt stated in his declaration that the

in this case, as Owners contends."  *Id.*

EAP criteria from *Benninger* are not obsolete.  Docket No. 44-2 at 7, ¶ 15 ("With respect

to the issues in the underlying claim and this action, the EAP Section remains materially

unchanged since February 2006.").

Plaintiff next argues that the law has changed since *Benninger*, which makes

anything Mr. Levy learned in *Benninger* outdated.  Docket No. 90 at 16–18.  Plaintiff

provides three examples.  First, plaintiff cites *Nunn v. Mid-Century Ins. Co.*, 244 P.3d

116 (Colo. 2010), which he asserts "led to a new branch of bad faith claims," providing

an "avenue for insurers to assert failure to cooperate defenses."  Docket No. 90 at 16–

17.  Although *Nunn* may have added an additional consideration in some bad faith

claims, there is no indication that *Nunn* is relevant to this case – or that it makes the

information in *Benninger* irrelevant.  *Nunn* also pre-dated *Benninger* so cannot amount

to a change in the law after *Benninger*.  Second, plaintiff cites Colo. Rev. Stat. § 10-3-

118, which he claims "set forth new requirements for asserting a failure to cooperate

defense."  *Id.* at 17.  Again, it is not clear that statute is relevant to this case or means

that what Mr. Levy learned in *Benninger* is outdated.  *See* Docket No. 103 at 9.  Third,

plaintiff cites *Bailey v. State Farm Mut. Auto. Ins. Co.*, 429 P.3d 109 (Colo. App. 2018),

which he argues "changed the topography" by holding that an EAP letter "amend[ed] the

terms of the tortfeasor's liability insurance policy . . . and precluded the injured party

from recovering any uninsured motorist benefits from his own insurer."  Docket No. 90

at 17.  These changes, however, are not relevant to this case, as defendant does not

rely on *Bailey*, and *Bailey* does not necessarily render obsolete the confidential

information that Mr. Levy has in his probable possession.  Although it may be true, as

plaintiff argues, that "any competent lawyer will obtain EAP-related discovery in this

case," *see id.* at 18, the non-EAP information that Mr. Levy learned in *Benninger* and in other representations would not necessarily be discoverable.  *See, e.g.*, *Persichette*, 462 P.3d at 590 ("Nor is Persichette likely to obtain the bulk of [the information, including "hierarchy of settlement authority, negotiation strategies, settlement pay ranges," "the factors Owners considers in assessing whether to settle a claim," or Mr. Levy's advice and counsel over the years] through discovery.").

The court in *Persichette* found this same sort of information is "likely relevant in this litigation in a way that will disadvantage Owners."  *Id.* at 591 ("Not surprisingly, the district court recognized that Persichette may well 'derive certain advantages' from Levy Law's prior representation of Owners.  We do too.").  Given that the Court has determined "the prior matters in which Levy Law represented [defendant] are 'substantially related' to [p]laintiff's case," *see In re Owners*, slip op. at 8, and that Levy Law is in probable possession of confidential factual information that is not obsolete, the Court finds that it is "difficult to fathom that [plaintiff] won't be advantaged – and, correspondingly, that [defendant] won't be disadvantaged – during settlement negotiations, in discovery, and at trial" because of the confidential information that Mr. Levy probably possesses.  *See Persichette*, 462 P.3d at 591–92.

Defendant's declarations confirm this.  Mr. Patterson, who attended high-level, confidential strategy meetings with Mr. Levy, states that, with Levy Law as plaintiff's lawyer, plaintiff will have an advantage due to Levy Law's "inside information about what issues to raise, facts and arguments to develop, what discovery to seek, and what current and past witnesses to pursue, that would exploit State Farm's perceived vulnerabilities."  Docket No. 44-6 at 11, ¶ 40.  Mr. Patterson also states that the

meetings "would give any person who attended a substantial advantage in suing State Farm in a case like the [this one] compared to a lawyer who had not attended" because a lawyer who attended "would be privy to confidential information identifying State Farm's perceived vulnerabilities to bad faith litigation, as expressed in an atmosphere of trust to fiduciary legal advisors," "would have inside knowledge of confidential documents that could be sought in discovery or misused against State Farm in bad faith litigation," and "would know the work-product-protected strategic and tactical thoughts of State Farm and its outside counsel as a group and could therefore adjust all manner of litigation strategy and tactics based on this inside information," which other lawyers do not have and which is not discoverable.  Docket No. 44-6 at 6, ¶¶ 20–21.  Past attendance at the meetings would also give Mr. Levy a "substantial advantage" in later challenging defendant's decision not to issue an EAP letter "because such a lawyer would not only know exactly what documents to seek in discovery to maximize the plaintiff's advantage on EAP-related issues," but the lawyer "would also have knowledge of unwritten and otherwise unknowable conversations with company personnel about important nuances, history, and other aspects of these issues," as well as "knowledge not ordinarily allowed in discovery of the circumstances of other claims in which EAP letters were or were not given."  *Id.* at 8–9, ¶¶ 29–30.

Defendant's current and former employees confirm that the information Mr. Levy learned about defendant would be "materially adverse" to defendant.  *See Stiger*, 413 F.3d at 1196; *see also* Colo. RPC. 1.9(a); ABA Model Rule 1.9(a).  Mr. Enriquez states that he has "no doubt that a lawyer who has received this confidential factual information would have a substantial advantage compared to a lawyer who does not

possess it in a case such as" this.  Docket No. 44-3 at 16, ¶ 59.  Mr. Vanderlugt states

that the "kind of confidential information" that Levy Law possesses "would be highly

valuable to any lawyer suing State Farm in any bad faith lawsuit and would give such a

lawyer a substantial advantage compared to lawyers who have not had such access to

State Farm" because a lawyer "who is familiar with this kind of information over time

could utilize it in settlement negotiations against State Farm" and "could follow a

negotiation strategy that attempts to exploit this confidential factual information to obtain

higher settlements than a lawyer who possesses no such confidential client

information."  Docket No. 44-2 at 10, ¶ 30.

The Court thus concludes that the confidential information Mr. Levy has learned

in his representation of defendant will materially advantage plaintiff and disadvantage

defendant.  Accordingly, defendant has shown all three necessary elements for Levy

Law's disqualification under Rule 1.9 – that "(1) an actual attorney-client relationship

existed between the moving party and the opposing counsel; (2) the present litigation

involves a matter that is 'substantially related' to the subject of the movant's prior

representation; and (3) the interests of the opposing counsel's present client are

materially adverse to the movant."  *See Stiger*, 413 F.3d at 1196 (quoting *Cole*, 43 F.3d

at 1383); *see also* Colo. RPC. 1.9; ABA Model Rule 1.9.

### D. The Remedy of Disqualification

"While the power to disqualify an attorney from a case 'is one which ought to be

exercised with great caution,' it is 'incidental to all courts, and is necessary for the

preservation of decorum, and for the respectability of the profession.'"  *United States v.*

*Collins*, 920 F.2d 619, 634 (10th Cir. 1990) (quoting *Ex Parte Burr*, 22 U.S. 529, 529–30

(1824)).  Although disqualification is an "extreme remedy," *see In re Owners*, slip op. at 8 (citing *Villas at Highland Park*, 394 P.3d at 1152), the Court finds disqualification of Mr. Levy and Levy Law appropriate.  In *Persichette*, the court found disqualification necessary to "preserve the integrity and fairness of the proceedings" and noted that there was no effective remedy outside of disqualification.  462 P.3d at 592 (citing *In re Estate of Myers*, 130 P.3d 1023, 1027 (Colo. 2006)).  The Court draws the same conclusion here because Levy Law's unfair advantage would threaten the integrity of these proceedings.  Moreover, disqualification of both Mr. Levy and his firm is appropriate here.  *See Stiger*, 413 F.3d at 1196 n.8; *Villas at Highland Park*, 394 P.3d at 1147 (noting that a conflict under Rule 1.9 can be imputed to the lawyer's firm); *cf. English Feedlot*, 833 F. Supp. at 1507 (holding that disqualification of a firm may not be necessary if conflicted attorneys have left the firm and no remaining attorneys have material information about the former client).[10]

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant's Motion to Disqualify Pursuant to *Persichette v. Owners Ins. Co.*, 462 P.3d 581 (Colo. 2020), and Federal Law [Docket No. 44] is **GRANTED**.  It is further

---

[10] Although *SLC Ltd.* "held that a lawyer who changes firms does not automatically disqualify his or her new law firm from taking a position adverse to the attorney's former client," that case "does not appear to contemplate the present situation wherein a law firm represents then sues the same entity."  *Helmer*, 2012 WL 6953341, at *4 n.5.

**ORDERED** that Mark R. Levy and Levy Law, P.C. are disqualified from representing plaintiff in this lawsuit.

DATED September 29, 2022.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge